Michael TOLER, Petitioner–Appellant,

v.

Kenneth MCGINNIS; Frank J. Kelly, Respondents–Appellees.

No. 99–1919.

United States Court of Appeals, Sixth Circuit.

Sept. 25, 2001.

Before SILER, MOORE, and CLAY, Circuit Judges.

OPINION

MOORE, Circuit Judge.

Petitioner–Appellant Michael Toler ("Toler") was convicted by a Michigan jury of conspiracy to possess with the intent to deliver 650 grams or more of cocaine and the delivery of 650 grams or more of cocaine. Toler was then sentenced to consecutive terms of life imprisonment. After unsuccessfully appealing his sentence and judgment in the Michigan state courts, Toler filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court of the Eastern District of Michigan. On July 7, 1999, the district court denied Toler's petition for writ of habeas corpus.

Toler now appeals the denial of his petition for writ of habeas corpus. This court granted Toler a certificate of appealability on two issues: (1) whether the state trial court erred when it refused Toler's request for a jury instruction regarding the jurisdictional requirement that Toler have the intent to commit an unlawful act that had a detrimental effect in Michigan; and (2) whether Toler was denied a fair trial due to prosecutorial misconduct. For the reasons that follow, we AFFIRM the district court's judgment.

I. BACKGROUND

This case arises out of an undercover police operation in which Toler, William Leflet ("Leflet"), Emil Mardenli ("Mardenli"), Mindy Brass, and Daniel Solomon, all residents of California, were arrested for the delivery of over 650 grams of cocaine to Michigan. On December 7, 1991, Leflet and Mardenli were arrested in Michigan after they had delivered one kilogram of cocaine to undercover police officers at the Holiday Inn in Troy, Michigan.

As a result of this arrest, Leflet agreed to cooperate with the police to help them reach his alleged cocaine source, Toler. According to Leflet, in addition to the one kilogram of cocaine that was delivered to the undercover officers in Michigan, Toler also had plans to send two more kilograms of cocaine to Michigan once he received payment for the first kilogram of cocaine. As part of a scheme to obtain evidence against Toler, the police allowed Leflet to make recorded phone calls to Toler in San Diego, California. Additionally, the police arranged for the delivery of $20,000 to Toler's place of business so as not to arouse any suspicion from Toler about the first delivery of cocaine in Michigan.

As the $20,000 was delivered to Toler's place of business in San Diego, police officers conducted a surveillance of Toler and

witnessed one of Toler's employees sign for the package. Thereafter, two additional kilograms arrived in Michigan. Once the additional cocaine arrived in Michigan, Toler was arrested by both Michigan and California police officers. A search of Toler's home and business revealed no money or drugs.

Toler was then extradited from California to Michigan on the sale charge only. Later, Toler was charged with counts for both the sale and delivery of and the conspiracy to sell and deliver more than 650 grams of cocaine. Toler's counsel immediately filed motions to quash, arguing that Toler had no intention of committing any acts to cause detrimental harm in Michigan and that the Michigan connection had been created by the police as a means for punishing Toler under Michigan's harsh anti-cocaine laws. These motions were denied, however, and Toler was tried by a jury on the offenses charged against him.

At trial, Leflet identified Toler as his source for cocaine. In explaining his connection to Toler, Leflet testified that he first became acquainted with Toler through a federal drug case, where Toler had been arrested for the manufacture of methamphetamine. Leflet further testified that, as a result of this case, he became Toler's bail bondsman and eventually became involved in the drug trade with Toler, including the transaction at the Holiday Inn in Troy, Michigan.

In testifying at trial, Leflet made repeated references to Toler's past convic-

tion for manufacturing methamphetamine. After repeated references to Toler's past experiences with the criminal justice system, in particular his arrest for and involvement in manufacturing methamphetamine, defense counsel finally objected to a reference to Toler's conviction. In response, the state trial court instructed the jury as follows:

> Well, the jury understands you are not to consider any references to that as evidence in the case. You're here for determination of whether the prosecution proves the charges against Michael Toler in this case.

Joint Appendix ("J.A.") at 393. Later, defense counsel objected again to references that Leflet made concerning Toler's past and current experiences with the criminal justice system, stating in relevant part:

> Your Honor, the prosecution elicited my client's in prison, that my client had an Idaho case, that my client had a San Diego case.... All kinds of information that really is irrelevant and I believe is so prejudicial I have to ask for a mistrial.

J.A. at 394. In response, the state trial court noted that the prosecutor's inquiry into Leflet's first meeting with Toler as a bail bondsman was invited by defense counsel's opening statement,[1] in which defense counsel "told the jury the relationship between Bill Leflet" and Toler.[2]

In addition to making references to Toler's past crimes and convictions, Leflet

---

1. On appeal, Toler does not contest Leflet's references to his past convictions. He contests such references only to the extent they involve statements about Toler's alleged methamphetamine lab in Mexico and Toler's alleged connection to the Mexican Mafia. Petitioner's Br. at 46–47.

2. At another instance during the trial, the state trial court instructed the jury as follows:

> All right. In any event, let me take this point to just instruct the jury. You're going to be ultimately deliberating as to your opinion of the facts and the evidence in this case. Any references to other allegations of criminal activity may be relevant in terms of deciding someone's credibility or having an understanding of different relationships, but they're not to be used as evidence in the case in chief.
>
> J.A. at 400.

also asserted that Toler had full access to a supply of cocaine from Mexico. Specifically, Leflet stated that, in the beginning of November, Toler told him that he could obtain unlimited amounts of cocaine from the Mexican Mafia and that he once met Toler in Mexico, where Toler had a lab for manufacturing methamphetamine. Defense counsel never objected to any testimony regarding the Mexican Mafia[3] and Leflet's meeting with Toler in Mexico.[4]

Defense counsel also never objected to the prosecutor's questions to Toler regarding alleged criminal activities by Toler's three brothers. Defense counsel did, however, object to the prosecutor's questions regarding Toler's possible gang affiliation[5] and to questions regarding the death of Robert Calvert.[6]

Toler's trial testimony contradicted that of Leflet and the prosecution's other witnesses. First, Toler testified that he par-

3. The closest defense counsel came to objecting to testimony of the Mexican Mafia was when he objected to Leflet's speculation resulting from the prosecutor's questions regarding what Leflet believed Toler's references to Davy's (the source) family problems. The exchange was as follows:

Q: Okay. Let me rephrase the question. When Michael Toler said that Davy was having a family problem, what does family mean?
A: It could be the Mexican Mafia.
MR. LUSTIG: He just said he didn't know.
THE COURT: He said could be. That means he has to speculate.

J.A. at 418.

4. The state trial court noted that references to the Mexican Mafia and the alleged manufacturing lab in Mexico were relevant. J.A. at 396.

5. The exchange regarding Toler's possible affiliation with a gang was as follows:

A: No, sir. Bill Leflet is a Mongol.
Q: Well, you're a gang member, aren't you, sir?
A: No, he is sir.
Q: Your chest. I'm sorry. Your chest. Do you recognize this photograph?
A: Yes, sir.
Q: What is that photograph of?
A: It's a photograph of me, sir.
MR. ROE: I'd like that marked for purposes of identification People's proposed 23.
MR. LUSTIG: Objection. It's not relevant.
MR. ROE: It is relevant.
THE COURT: Well, let me hear what it's relevant for.
BY MR. ROE, CONTINUING:
Q: Tell me what it is that's tattoo'd across your stomach.
A: Dago.

Q: What does that mean?
A: San Diego. It's San Diego. It's the city I'm from.
Supplemental Joint Appendix ("Supp. J.A.") at 94 (Toler Test.).

6. The exchange regarding the murder of Calvert was as follows:

Q: And this morning William Leflet testified the person he knows as Robert Calvert is now deceased?
A: Yes.
Q: And you're familiar with the investigation revolving around that homicide?
A: Somewhat.
THE COURT: What would be the relevance?
MR. ROE: Mr. Lustig explored that with Mr. Leflet.
MR. LUSTIG: Let's approach. This is bull shit [sic].
(Bench conference held)
THE COURT: Were you involved in that investigation at all, the one involving Calvert?
THE WITNESS: No, your Honor.
THE COURT: Okay. Let's move on.
MR. ROE: Yes. Judge, let me follow that question up, if you will, Judge.
BY MR. ROE, CONTINUING:
Q: But you did have a conversation regarding information as it related to that homicide, did you not?
A: Yes.
Q: So to some extent you were involved in that investigation, were you not?
A: I had some knowledge of it.
Q: Okay, Were you familiar who the suspects were?
THE COURT: Well, let's not get off into something that's tangential.
J.A. at 423–24 (Murphy Test.).

ticipated in the cocaine drug sales in Michigan only at the request of Leflet, his bail bondsman, because Toler was physically afraid of Leflet and was afraid that Leflet would report that Toler had traveled to Mexico with his girlfriend in violation of his bonds. Toler further testified that his only involvement in the charged Michigan drug transactions was in introducing Leflet to Davy, an alleged source of cocaine. Toler also asserted that he had no idea that Leflet was calling him from Michigan when Leflet spoke to him after December 7, 1991.

At the trial's end, the jury convicted Toler of conspiracy to possess with the intent to deliver 650 grams or more of cocaine and the delivery of 650 grams or more of cocaine. Toler was then sentenced to consecutive terms of life imprisonment. Toler appealed his conviction and sentence, asserting the following grounds for relief: (1) the trial court erred in refusing to instruct on simple possession of over 650 grams of cocaine as a lesser offense to the delivery count; (2) the trial court erred in giving an aiding and abetting theory after the prosecution indicated that it was not relying on that theory; (3) the trial court erred in refusing to instruct the jury that Toler must have intended to cause a harm in Michigan as a prerequisite to finding him guilty; (4) the trial court improperly exercised jurisdiction over him; (5) the trial court erred in refusing to dismiss the sale and delivery charge due to entrapment; (6) the trial court erred in refusing to dismiss the sale and delivery charge because the Interstate Agreement on Detainers had been violated; (7) he was denied a fair trial because of prosecutorial misconduct; and (8) the trial court erred in imposing consecutive sentences.

The Michigan Court of Appeals affirmed Toler's conviction and sentence on August 27, 1996. With regard to the state trial court's refusal to give the requested instruction on jurisdiction, the Michigan Court of Appeals, the last state court to issue a written order on this issue, stated that "Given [the] facts, no reasonable juror could fail to find that jurisdiction vested in Michigan. Therefore, the trial court did not err in refusing to give the instruction." J.A. at 60. With respect to Toler's prosecutorial misconduct claims, the Michigan Court of Appeals held that Toler had "waived any error stemming from questions about the Mexican Mafia and about his brothers' criminal records because there was no objection to this," that the questions about Toler's gang membership did not deny him a fair trial, that the "prosecutor made no clear implication that [Toler] was involved in" the murder of Robert Calvert, and that the prosecutor did not "improperly vouch for Leflet's credibility by suggesting that he had some special knowledge concerning his truthfulness." J.A. at 61. On December 23, 1997, the Michigan Supreme Court denied Toler's request for leave to appeal.

After exhausting his remedies in the Michigan state courts, Toler filed a petition for writ of habeas corpus in the United States District Court for the Eastern District of Michigan. On July 7, 1999, the district court denied Toler's petition for writ of habeas corpus, holding, in relevant part, that Toler's jurisdictional claim was not reviewable on a petition for federal habeas corpus relief because it involved only a state law matter and that Toler's prosecutorial misconduct claims lacked merit.

## II. ANALYSIS

Toler argues that he is entitled to habeas relief because the Michigan Court of Appeals, the last state court to issue a reasoned decision, rendered a decision that both was contrary to and involved an unreasonable application of clearly estab-

lished Supreme Court precedent (1) by holding that the state trial court's refusal to instruct the jury on Michigan's extraterritorial jurisdictional requirement was harmless error; and (2) by failing to conclude that Toler had been denied a fair trial because of prosecutorial misconduct.

A. Standard of Review

██ We review de novo a district court's decision on a petition for writ of habeas corpus. *See Carter v. Bell,* 218 F.3d 581, 590 (6th Cir.2000). We will not grant a writ of habeas corpus for any claim adjudicated on the merits in state court unless the adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2) (2000); *see also Penry v. Johnson,* 532 U.S. 782, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). In *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court explained the precise meaning of the language in § 2254(d). The Supreme Court explained that a state court's decision is "contrary to" clearly established Supreme Court precedent when it is "opposite to that reached by this Court on a question of law" or faces a set of facts that are "materially indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite result. *Id.* at 405, 120 S.Ct. 1495. The Supreme Court further explained that a state court decision involves an unreasonable application of clearly established Supreme Court precedent when it correctly identifies the governing legal principle in the case but applies that principle to the facts of the defendant's case in an objectively unrea-

sonable manner. *Id.* at 407–09, 120 S.Ct. 1495; *see also Penry,* 532 U.S. at ——, 121 S.Ct. at 1918. In analyzing whether a state court's decision is "contrary to" or an "unreasonable application of" clearly established Supreme Court precedent, we look only to the holdings of the Supreme Court's decisions as of the time of the relevant state-court decision. *Doan v. Brigano,* 237 F.3d 722, 729 (2001).

B. Jury Instruction On Extraterritorial Jurisdiction

Toler argues that the state trial court deprived him of his Sixth Amendment right to a jury trial by refusing to instruct the jury that it must find that he intended a harm in Michigan before convicting him of the charged crimes. The Michigan Court of Appeals was the last state court to render a written decision on this issue, holding:

Defendant contends that the trial court erred in refusing to instruct the jury that he must have intended to cause a harm in Michigan as a prerequisite to finding him guilty. Although *Commonwealth v. Bighum,* 452 Pa. 554, 307 A.2d 255, 258–59 (1973), held that such an instruction is proper where jurisdiction depends upon the resolution of disputed facts, the court there also held that the refusal to so instruct is not error requiring reversal if no reasonable juror could fail to find that jurisdiction vested with the state. Here, the evidence is undisputed that the drugs were sent to Michigan. There was also some evidence that defendant had discussed renting a place in Detroit to facilitate the delivery of future shipments. Given these facts, no reasonable juror could fail to find that jurisdiction vested in Michigan. Therefore, the trial court did not err in refusing to give the instruction.

J.A. at 60; *see also* J.A. at 448 (request for instruction), 460–61 (post-trial). In deny-

ing Toler's petition for habeas on this claim, the district court concluded that such claim was not reviewable on habeas review because it concerned only a matter of Michigan state law.

■■■ We conclude that the district court did not err in denying Toler habeas relief based upon the state trial court's refusal to give a jury instruction on the requirements for extraterritorial jurisdiction in Michigan. It is well-settled that "state-law violations provide no basis for federal habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 67–68 n. 2, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Simpson v. Jones*, 238 F.3d 399, 407 (6th Cir.2000). In this case, Toler's claim for habeas relief would be contingent upon our interpretation of an alleged violation of Michigan law, specifically whether the Michigan Supreme Court intended to make extraterritorial jurisdiction an element of the offense to be decided by the jury in cases where the jurisdictional facts are disputed and are intertwined with the merits and whether the state trial court violated that law by not giving Toler's jury an instruction on

extraterritorial jurisdiction. *See People v. Blume*, 443 Mich. 476, 505 N.W.2d 843, 845 (1993) (holding that a state trial court may exercise jurisdiction over acts that occur outside the state's physical borders if such acts were " 'intended to have, and ... actually d[id] have, a detrimental effect within the state.' ") (quoting *Strassheim v. Daily*, 221 U.S. 280, 285, 31 S.Ct. 558, 55 L.Ed. 735 (1911)).[7] Consequently, the district court correctly concluded that it had no authority on habeas review to review the Michigan Court of Appeals's decision on this issue.

■■■ Even if Toler's jurisdictional argument were correct and reviewable by federal courts on habeas review, we would still not grant Toler habeas relief on this claim because such error by the state trial court would have been harmless.[8] In habeas cases, we apply the "substantial and injurious effect' standard" for harmless error from *Brecht v. Abrahamson*, 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). *Gilliam v. Mitchell*, 179 F.3d 990, 994–95 (6th Cir.1999), *cert. denied*, 528

**7.** Several other state courts have determined that jurisdiction is a factual question to be decided by the jury when the facts necessary to support jurisdiction are in dispute and intertwined with the merits of the case. *See State v. Collin*, 687 A.2d 962, 964 (Me.1997); *State v. Willoughby*, 181 Ariz. 530, 892 P.2d 1319, 1325 (1995); *State v. Liggins*, 524 N.W.2d 181, 184–85 (Iowa 1994); *Commonwealth v. Travis*, 408 Mass. 1, 556 N.E.2d 378, 382 (1990); *State v. Butler*, 353 Md. 67, 724 A.2d 657, 663 (1999); *State v. Bragg*, 295 N.J.Super. 459, 685 A.2d 488, 491 (1996); *State v. Bratrud*, 204 Wis.2d 445, 555 N.W.2d 663, 663–64 (App.1996); *see also* WAYNE R. LAFAVE, JEROLD ISRAEL, & NANCY J. KING, 4 CRIMINAL PROCEDURE § 16.4(d) (2001) ("The dominant view is that jurisdiction (where contested) must be established by proof beyond a reasonable doubt."). We cannot discern from *Blume* whether the Michigan Supreme Court intended to make the requirements for extraterritorial jurisdiction an element of the offense in cases where the

facts that are necessary to extraterritorial jurisdiction are in dispute. If the Michigan Supreme Court were to follow the view of the majority of jurisdictions, it is clear that it would have been a constitutional error for the state trial court not to instruct the jury on the requirements for extraterritorial jurisdiction in Michigan because the United States Supreme Court has held that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The Michigan Court of Appeals did not apparently view *Blume* as requiring jurisdiction to be an element of the offense.

**8.** The Supreme Court has specifically held that the failure to charge a jury on an element of an offense can constitute harmless error. *Neder v. United States*, 527 U.S. 1, 8–9, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

U.S. 1120, 120 S.Ct. 945, 145 L.Ed.2d 821 (2000). In this case, in order to find Toler guilty of conspiracy, the jury had to find that Toler knew of the conspiracy, knew of the objective of the conspiracy (to deliver and sell cocaine to the intended third parties), and intended to participate cooperatively to further that objective. *Blume,* 505 N.W.2d at 848; *see also People v. Justice,* 454 Mich. 334, 562 N.W.2d 652, 658–59 (1997). Given the evidence presented at Toler's trial, including Toler's testimony on his own behalf,[9] the jury's finding of guilt against Toler necessarily required the conclusion that Toler had committed an act with the intent to have a detrimental effect in Michigan. It is undisputed that the cocaine was both delivered and sold in Michigan.[10] *See, e.g., United States v. Warren,* 984 F.2d 325, 327–28 (9th Cir.1993) (concluding that the district court's failure to instruct on the jurisdictional element of the offense did not constitute reversible error because it did not affect the verdict). Had the jury believed Toler's testimony that his only involvement was in introducing Leflet to Davy, a source of cocaine, and that he did not agree to join any other action, the jury could not have found Toler guilty of conspiracy to possess cocaine with the intent to distribute or of the delivery of cocaine in Michigan because the jury could not have determined that Toler entered into an agreement for the unlawful purpose of distributing cocaine to the intended third parties. *See Justice,* 562 N.W.2d at 657–59 & n. 21 (Under a conspiracy, "two or more individuals must have voluntarily agreed to effectuate the commission of a criminal offense.... [W]here a defendant is unaware of the overall objective of an alleged conspiracy or lacks any interest in, and therefore any commitment to, that objective, he is not a member of the conspiracy."). Thus, even if erroneous, the state trial court's refusal to give an instruction on the requirement for extraterritorial jurisdiction in Michigan could not have affected the jury's verdict against Toler and thus did not affect Toler's substantial rights. *See Neder,* 527 U.S. at 18, 119 S.Ct. 1827; *see also* FED. R. CRIM. P. 52(a). In sum, even if Toler's jurisdictional argument were correct and reviewable by federal courts, it was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent for the Michigan Court of Appeals to conclude that Toler's claim regarding the state trial court's failure to give a jury instruction on extraterritorial jurisdiction did not warrant reversal. Therefore, we affirm the district court's denial of Toler's petition for a writ of habeas corpus on this ground.

C. Prosecutorial Misconduct

Toler also argues that the state trial court deprived him of due process under

9. The prosecution's evidence included testimony from Leflet and recorded telephone conversations that indicated that Toler knew of the planned cocaine transactions in Michigan; testimony from Leflet and recorded telephone conversations between Toler and Leflet, which revealed Toler's plan to deliver two additional kilograms of cocaine after receiving payment for the sale of the first kilogram in Michigan; Leflet's testimony that he told Toler he was going to deliver the cocaine in Michigan; and the actual delivery of three kilograms of cocaine to Michigan. Toler testified that his participation consisted only of his introducing Leflet to Davy, an alleged cocaine source.

10. In this sense, this case is distinguishable from *Barker v. Yukins,* 199 F.3d 867, 874–75 (6th Cir.1999), *cert. denied,* 530 U.S. 1229, 120 S.Ct. 2658, 147 L.Ed.2d 273 (2000), in which this circuit held that the state trial court's failure to give an instruction on when the use of deadly force in defense of rape could constitute self-defense was not harmless error, because in this case it is the jury's, not the judge's, judgment that controls.

the Fifth and Fourteenth Amendments when the prosecutor committed prosecutorial misconduct by implying that he was a member of the Mexican Mafia and a gang member and that Toler's brothers were drug traffickers and suspected murderers. The Michigan Court of Appeals was the last state court to render a written decision on this issue, stating:

> Defendant claims he was denied a fair trial because of prosecutorial misconduct. We disagree. Questions of misconduct by the prosecutor are decided case by case. On review, this Court examines the pertinent portion of the record and evaluates the prosecutor's remarks in context to determine whether the defendant was denied a fair and impartial trial. In the instant case, defendant has waived any error stemming from questions about the Mexican Mafia and about his brothers' criminal records because there was no objection to this. Further, we do not believe the questions about defendant's gang membership denied him a fair trial given that he denied membership and the court refused to allow in pictures of an alleged gang-related tattoo. Also, contrary to defendant's claim, the prosecutor made no clear implication that defendant was involved in a murder. Nor did the prosecutor improperly vouch for Leflet's credibility by suggesting that he had some special knowledge concerning his truthfulness. Therefore, defendant was not denied a fair trial.

J.A. at 61 (internal citations omitted). The district court upheld the denial of Toler's petition for habeas relief on the same grounds asserted by the Michigan Court of Appeals.

 We conclude that the district court did not err in denying Toler habeas relief based upon his prosecutorial misconduct claims, as the Michigan Court of Appeals's decision was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). For habeas relief to be granted based upon prosecutorial misconduct, the alleged prosecutorial misconduct must have " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). In determining whether alleged prosecutorial misconduct infected a petitioner's trial with unfairness, a court must first consider whether the misconduct was improper. Thereafter, the court must consider whether the misconduct, if found to be improper, so infected the trial as to amount to a violation of due process. In so doing, a court should evaluate the following factors: (1) whether the prosecutor's improper comments were isolated or pervasive; (2) whether they were deliberately or accidentally placed before the jury; (3) whether they were invited by defense counsel's remarks; (4) the degree to which the remarks had a tendency to mislead and prejudice the defendant; (5) whether the prosecutor manipulated or misstated the evidence; (6) the strength of the overall proof establishing guilt; (7) whether the remarks were objected to by counsel; and (8) whether a curative instruction was given by the court. *See Darden*, 477 U.S. at 181–83, 106 S.Ct. 2464; *United States v. Young*, 470 U.S. 1, 12–13, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *DeChristoforo*, 416 U.S. at 644–47, 94 S.Ct. 1868.

Applying these factors to this case, we conclude that Toler failed to show that the Michigan Court of Appeals unreasonably concluded that his prosecutorial misconduct claims did not warrant reversal. At the outset, we note that Toler's claims regarding the Mexican Mafia, a drug lab in Mexico, and his brothers are procedurally defaulted. It is well-settled that federal habeas relief is not available for claims that were procedurally barred because of state procedural default, unless cause and prejudice for the default can be established. *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). For the doctrine of procedural default to bar federal habeas review, however, a "firmly established and regularly followed" state procedural rule applicable to the petitioner's claim must exist, and the petitioner must have failed to comply with that rule. *See Ford v. Georgia*, 498 U.S. 411, 423–24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991). Under Michigan law, objections not raised at trial are procedurally barred absent a showing that barring the claims would create a "miscarriage of justice." *People v. Duncan*, 402 Mich. 1, 260 N.W.2d 58, 61–62 (1977); *People v. Gonzalez*, 178 Mich.App. 526, 444 N.W.2d 228, 232 (1989). A miscarriage of justice does not exist if the prejudicial effect of alleged improper conduct could have been removed by a timely instruction, had one been requested. *See Gonzalez*, 444 N.W.2d at 232.

In this case, Toler failed to comply with Michigan's contemporaneous objection rule when he failed to object to the references made about him and the Mexican Mafia and a drug lab in Mexico and the alleged criminal activities of his brothers during trial. Additionally, we believe that Toler failed to assert cause for the default and failed to show that the application of Michigan's contemporaneous objection rule to his claims would result in a miscarriage of justice. *See, e.g., Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir.2000). In fact, we believe that, even if the challenged comments were improper, such comments easily could have been cured by appropriate instruction from the trial court. Therefore, we hold that any prosecutorial misconduct claims based upon references to the Mexican Mafia, a drug lab in Mexico, and Toler's brothers are procedurally defaulted.[11]

We further conclude that the district court did not err in denying Toler habeas relief based upon his arguments regarding references to the murder of Calvert and to Toler's alleged membership in a gang. Our review of these exchanges at trial reveals that the Michigan Court of Appeals's decision that such comments did not render Toler's trial unfair was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. Although the comments about Calvert were clearly improper and were deliberately placed before the jury, they did not infect the trial with such unfairness as to make Toler's conviction a denial of due process. Indeed, these comments were isolated, occurring only once during trial; had only a slight tendency for misleading the jury because Toler was never specifically mentioned during the dialogue

---

11. Toler attempts to argue that this contemporaneous objection rule does not bar review of his claims regarding references to the Mexican Mafia, a drug lab in Mexico, and his brothers because such rule was not firmly established or regularly followed under Michigan law. In so doing, however, Toler fails to point to any cases in which the contemporaneous objection rule was not followed, and our review of Michigan case law suggests that the rule was regularly and consistently followed. *See, e.g., Duncan*, 260 N.W.2d at 63; *People v. Delgado*, 404 Mich. 76, 273 N.W.2d 395, 399–400 (1978); *People v. Vaughn*, 186 Mich.App. 376, 465 N.W.2d 365, 384–85 (1990); *Gonzalez*, 444 N.W.2d at 232.

about Calvert; and were appropriately and quickly interrupted by the judge once a high potential for prejudice arose. Likewise, although the comments about Toler's alleged gang membership were deliberately placed before the jury, they did not render his trial unfair, as they occurred only once during trial; were not improper in light of Toler's statement that Leflet, a prosecution witness, was a gang member of the Mongols; and had no tendency for misleading and prejudicing the jury against Toler in light of Toler's response that he was not a gang member. Finally, we believe that the strength of the evidence against Toler was overwhelming, including testimony from his co-conspirators, taped conversations regarding the delivery and sale of drugs between Toler and Leflet, and the actual delivery of drugs in Michigan as detailed in conversations between Toler and Leflet. In sum, applying the applicable factors as set forth by the Supreme Court in *Darden, Young,* and *DeChristoforo,* we hold that the district court did not err in denying Toler habeas relief on his prosecutorial misconduct claims.

## III. CONCLUSION

For the reasons stated above, we AFFIRM the district court's judgment.