No. 121,927

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

SHON FERRIS JACKSON,
*Appellant*.

SYLLABUS BY THE COURT

1.

In *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the Supreme Court of the United States held that exercising a peremptory challenge against a prospective juror based solely on that person's race violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

2.

There are at least two evils that arise from the State's use of peremptory challenges for race-based reasons. A defendant may be denied the right to equal protection under the law if he or she is tried by a jury from which members of his or her race have been purposefully excluded. And citizens who are excluded from jury service because of their race are denied an equal opportunity to participate in the judicial process.

3.

A *Batson* challenge must be raised in a manner that allows the district court to fashion a remedy in the event a violation has occurred. In Kansas, a *Batson* challenge must be raised before the unselected venire members are released and before the jury is sworn.

1

Appeal from Wyandotte District Court; MICHAEL A. RUSSELL, judge. Opinion filed July 30, 2021. Convictions affirmed, sentence vacated, and case remanded with directions.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Daniel G. Obermeier*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before WARNER, P.J., BUSER and CLINE, JJ.

WARNER, J.: A jury found Shon Jackson guilty of two counts of aggravated robbery and one count of criminal possession of a weapon. He now challenges the racial composition of the jury who heard his case under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), noting that all the Black potential jurors in the jury pool were removed either for cause by the court or through peremptory challenges before the jury was empaneled. He also asserts the court should have instructed the jury that robbery and theft were lesser included offenses of aggravated robbery. And he claims that the court erred at sentencing when it treated a previous conviction from Missouri as a person offense and thus improperly calculated his criminal history score.

After carefully reviewing the record, we find that the district court did not err when it overruled Jackson's *Batson* objection, as he raised that issue after the jury was sworn and all other potential jurors were dismissed. As such, he did not bring the matter to the court's attention within the time required by Kansas law, or when the court could take any meaningful action short of a mistrial that would allow the trial to proceed. We also find that instructions on robbery and theft were not factually appropriate in this case. But we agree—and the State concedes—that the court erred when it classified Jackson's earlier Missouri conviction as a person felony at sentencing. We therefore affirm Jackson's convictions but vacate his sentence and remand for resentencing.

FACTUAL AND PROCEDURAL BACKGROUND

Early on the morning of May 14, 2018, a man with a handgun robbed a 7-Eleven convenience store in Kansas City. The clerk described the person as a Black man wearing jeans, a black shirt, a white cloth on his head, and a black sleeve on his left forearm. The store's security camera, which recorded the robbery, confirmed this description.

Six days later, a Black man dressed in similar clothes—including a white headcloth and black sleeve on his arm—entered the 7-Eleven, took out a handgun and a small black bag, and demanded money and cigarettes. The clerk filled the bag with money and placed a carton of cigarettes on the counter. The man then ran out of the store and down the street. The clerk came outside, and he and a customer began to drive around searching for the man. They saw him hiding behind a tree in a nearby field before he disappeared into a small wooded area.

Police established a perimeter around the woods and sent officers, including a canine unit, to search for the man. In a small clearing, the dog alerted to someone under a piece of plywood. A man, later identified as Jackson, told officers that they had found him and to get the dog. The dog bit Jackson's leg, and police placed him under arrest.

Jackson, who had a tattoo on his left forearm and wore clothing matching the robber's, was subsequently searched. Police found a bag of marijuana and a black sock with the toe cut off. Officers also felt a bulge in Jackson's pant leg, to which he responded, "You just hit the jackpot." The bulge was a black bag containing money. And police found a handgun under some brush near where Jackson had been seen hiding earlier. After the search, Jackson was taken to a hospital to treat his bite wound.

The State charged Jackson with criminal possession of a firearm and two counts of aggravated robbery. At trial, Jackson testified he had not robbed the 7-Eleven. He stated

that he was homeless in May 2018 and spent time at a casino, where he often won. He testified that he was likely at the casino on May 14, and on May 20, he was going to meet someone to buy marijuana with his winnings. He explained that he wore the black sock over his tattoo to avoid attention from gangs. But given the amount of police activity that evening, his carrying marijuana, and his criminal record, Jackson decided to hide under the plywood to avoid being caught.

After hearing the witnesses' testimony and considering the other evidence presented, the jury found Jackson guilty of the firearm possession and two aggravated-robbery charges. The district court imposed a controlling 206-month prison sentence.

DISCUSSION

Jackson raises three issues on appeal. First, he argues the district court erred when it denied his *Batson* challenge, as all Black prospective jurors were removed from the jury pool either for cause or through peremptory strikes. Second, he asserts that the court should have instructed the jury on the lesser included offenses of robbery and theft. And third, he claims the court miscalculated his criminal history score at sentencing by classifying a prior Missouri conviction as a person felony. For the reasons we discuss in this opinion, we find that Jackson has not shown the district court erred during his jury trial, either in overruling his untimely objection to the jury panel or in its instructions. But we agree that the court misclassified Jackson's Missouri conviction as a person felony.

1. *The district court did not err when it found that Jackson did not raise a timely* Batson *challenge to the selection of the jury.*

During jury selection, Jackson's attorney and the State questioned 45 potential jurors—a group commonly described as the venire or jury pool. As the selection process continued, the court excused four of these people for cause, finding their current circumstances or mindset prevented them from serving as impartial members of the jury.

4

See K.S.A. 22-3410(2)(i). Then, once the parties and the court had conducted their respective examinations, the parties agreed to allow the prospective jurors to leave the courtroom as they decided their peremptory challenges and selected a jury.

Unlike challenges for cause, peremptory challenges can be used to remove prospective jurors from the venire for any nondiscriminatory reason. The aim of both challenges is the same—"to achieve an impartial jury." *State v. McCullough*, 293 Kan. 970, 996, 270 P.3d 1142 (2012). The district court allowed Jackson and the State nine peremptory strikes each, with the goal of selecting of a 13-person jury panel—12 jurors and 1 alternate juror. By this process, the parties selected a jury and an alternate. The record does not reflect which potential jurors were struck by Jackson or the State.

Before officially empaneling Jackson's jury, the court asked the parties if anyone had any objections. Both sides indicated they did not. The court thus invited the venire members back into the courtroom, called the jurors selected for the trial to the jury box, and dismissed the remaining venire. The court then administered the oath to the jury and released the jurors on their lunch break.

The 13 members of the jury were selected from the first 35 prospective jurors in the venire. Nine of those 35 prospective jurors were Black, but none of the Black potential jurors were selected for the jury. The court had excused three Black prospective jurors for cause (out of the court's four cause-based determinations):

- One Black potential juror informed the court that his wife had recently suffered a heart attack, and he was her sole caretaker. The parties agreed that he should be excused for cause.

- A second Black potential juror indicated she had recently been the victim of a crime and was not convinced she could decide the case fairly based on the

evidence. She also indicated that her husband had just gotten out of the hospital and she needed to be with him. Jackson's attorney indicated he had no objection to the court releasing this woman for cause, and the court did so.

- A third Black potential juror became angry as jury selection progressed, as the timing of the jury trial made it impossible for him to run his landscaping business. After a lengthy discussion outside the presence of the other members of the venire, the court excused him for cause, finding he had made up his mind that he could not be fair and impartial. Neither party objected to this man's dismissal.

The six remaining Black prospective jurors were removed by the parties' peremptory strikes. Again, the record before us does not specifically identify whether these individuals were struck from the jury by the State, by Jackson, or by some combination of the parties. But after the jury rendered its verdict, Jackson filed a motion for a new trial, indicating that all six individuals had been removed by the State. The State does not dispute this point. The resulting jury was composed of predominately white jurors, with 3 of the 13 jurors identifying as Hispanic or Native American.

Immediately after the court excused the now-sworn jury for lunch, Jackson's attorney conferred with Jackson. She then addressed the court, expressing "concern" that all the Black prospective jurors had been removed from the jury, though she was not sure whether she was "raising a *Batson* challenge." In response, the State argued that Jackson's objection to the jury composition was untimely, as it was made after the other prospective jurors had been released and the jury sworn. The court agreed, noting that Jackson had an opportunity to raise his concern to the State's peremptory strikes when those strikes were made. The court therefore overruled Jackson's objection, though it indicated it would allow Jackson to make a record of the reasons for his dissatisfaction after the lunch recess.

When the trial resumed, Jackson's attorney indicated she did not realize all the Black prospective jurors had been struck until after the jury had been seated and the oath administered. She acknowledged she did not object contemporaneously as the peremptory strikes were made, but she nevertheless wanted the prosecutor to explain his reasons for striking those six prospective jurors so there could be a record of the State's rationale. Relying on *State v. Heiskell*, 21 Kan. App. 2d 105, 896 P.2d 1106 (1995), the court once again found Jackson's objection untimely. And the court denied Jackson's request to question the prosecutor on the record. The court then brought the jury back into the courtroom, and the parties made their opening statements.

In *Batson*, the Supreme Court held that exercising a peremptory challenge against a prospective juror based solely on that person's race violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. 476 U.S. at 89. There are at least two evils that arise from the State's use of peremptory challenges for race-based reasons. A defendant may be denied the right to equal protection of the law if he or she is tried by a jury "from which members of [his or her] race have been purposefully excluded." 476 U.S. at 85. And citizens who are excluded from jury service because of their race are denied an equal opportunity to participate in the judicial process. 476 U.S. at 85. Indeed, the "very integrity of the courts is jeopardized when a prosecutor's discrimination 'invites cynicism respecting the jury's neutrality' . . . and undermines public confidence in adjudication." *Miller-El v. Dretke*, 545 U.S. 231, 238, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005).

Subsequent cases from the United States Supreme Court and the Kansas Supreme Court recognize that parties' jury-selection decisions are often motivated by more complicated considerations than racial discrimination. See 545 U.S. at 238; *State v. Gonzalez-Sandoval*, 309 Kan. 113, 120-21, 431 P.3d 850 (2018). Parties' decisions during jury selection can be "subject to myriad legitimate influences, whatever the race of the individuals on the panel from which jurors are selected." *Miller-El*, 545 U.S. at 238. For

7

this reason, courts generally presume "the legitimacy of prosecutors' strikes" unless a defendant can show that no such legitimate reason existed for those decisions or convince the court that the reasons offered are pretextual. 545 U.S. at 238; *Gonzalez-Sandoval*, 309 Kan. at 120-21.

*Batson* established a three-step process for analyzing whether a particular use of peremptory strikes violates the Equal Protection Clause. First, the party raising a *Batson* challenge must make a prima-facie showing that, based on the totality of the relevant facts, one or more peremptory strike was likely used for discriminatory reasons. *Gonzalez-Sandoval*, 309 Kan. 113, Syl. ¶ 3. Once this initial showing has been made, the burden shifts to the State to provide the reason—including any nondiscriminatory reason—for its strike. 309 Kan. 113, Syl. ¶ 4. The defendant then has the ultimate burden of persuasion to convince the court whether the explanation given is a pretext for racial discrimination. 309 Kan. 113, Syl. ¶ 7.

*Batson* also recognized that equal-protection challenges are subject to practical and procedural limitations. Relevant here, the *Batson* Court suggested that a party must timely object to a peremptory challenge so that a district court could address and correct any violations before a trial proceeds. See 476 U.S. at 99 ("We decline, however, to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges."). Later, in *Ford v. Georgia*, 498 U.S. 411, 111 S. Ct. 850, 112 L. Ed. 2d 935 (1991), the Court clarified that state courts are free to define when and how a *Batson* objection must be raised. See 498 U.S. at 423 ("Undoubtedly, then, a state court may adopt a general rule that a *Batson* claim is untimely if it is raised for the first time on appeal, or after the jury is sworn, or before its members are selected.").

In *Heiskell*, we accepted the Supreme Court's invitation and held that a party must raise a *Batson* challenge before the jury is sworn in order for it to be considered. *Heiskell*, 21 Kan. App. 2d 105, Syl. ¶ 1. In *Heiskell*, the defendant deliberately waited to raise his

8

*Batson* challenge until after the State had presented its first witness. This court found that this objection was raised too late to be considered, explaining that a party waives a *Batson* challenge by failing to object to a race-based peremptory strike in a manner that would allow the court to cure the discriminatory action. 21 Kan. App. 2d at 107-08. Put more simply, the *Heiskell* court held that a *Batson* challenge must be raised before the last juror, including any alternate jurors, is sworn. 21 Kan. App. 2d 105, Syl. ¶ 1.

In reaching this conclusion, *Heiskell* relied on the Fifth Circuit Court of Appeals' decision in *United States v. Forbes*, 816 F.2d 1006, 1011 (5th Cir. 1987), which explained two "equally important" reasons for limiting the time frame in which an objection to a peremptory strike may be exercised:

- "'The "timely objection" rule is designed to prevent defendants from "sandbagging" the prosecution by waiting until trial has concluded unsatisfactorily before insisting on an explanation for jury strikes that by then the prosecutor may largely have forgotten.'" *Heiskell*, 21 Kan. App. 2d at 108 (quoting *Forbes*, 816 F.2d at 1011).

- "'[P]rosecutorial misconduct is easily remedied prior to commencement of trial simply by seating the wrongfully struck venireperson. After trial, the only remedy is setting aside the conviction.'" *Heiskell*, 21 Kan. App. 2d at 108 (quoting *Forbes*, 816 F.2d at 1011).

Jackson acknowledges that he did not object to the composition of the jury or the State's use of peremptory strikes before the remaining prospective jurors were released and the jury sworn. But he argues that this court should revisit its decision in *Heiskell* and adopt a more elastic concept of timeliness. He also attempts to distinguish his *Batson* challenge from the untimely objection in *Heiskell*, arguing that *Heiskell*'s holding focuses on a person's intent in raising an objection at a certain time, not the timing alone. See

9

*Heiskell*, 21 Kan. App. 2d at 108 ("Because Heiskell *intentionally waited* until after the jury had been sworn before making his *Batson* claim, we conclude that he failed to preserve this issue for our review." [Emphasis added.]). These arguments present legal questions over which our review is unlimited. *State v. Campbell*, 308 Kan. 763, 770, 423 P.3d 539 (2018) (preservation challenges are subject to plenary review).

As a preliminary matter, Jackson argues that *Heiskell*'s main concern—preventing parties from strategically delaying a *Batson* challenge until after a jury is sworn and prejudice attaches—is not present in this case. In other words, Jackson asserts that *Heiskell*'s rule was motivated by concerns of improper intent, not timing. But Jackson's description of *Heiskell* is incomplete. The *Heiskell* court was undeniably concerned by the defendant's strategic delay in that case, but it was the delay itself—waiting until after the unselected venire members had been dismissed, the jury sworn, and the trial commenced—that rendered the defendant's action so problematic. As *Heiskell* observed, the "timely objection rule . . . prevent[s]" a defendant from acting improperly. 21 Kan. App. 2d at 108. We thus turn to the reasons for *Heiskell*'s timely objection requirement.

To start, we note that Kansas courts are not alone in our requirement that parties raise *Batson* challenges before the jury oath is administered. Courts across the country have held almost uniformly that a *Batson* challenge must be raised—at the latest—before the remaining venire members are dismissed and the jury is sworn. In adopting this rule, the federal Circuit Courts of Appeal have generally emphasized that the timely objection requirement allows courts an opportunity to remedy any error while the remaining prospective jurors are still present and available. See, e.g., *Brewer v. Marshall*, 119 F.3d 993, 1002 n.13 (1st Cir. 1997) (requiring objection contemporaneous with challenged peremptory strike); *McCrory v. Henderson*, 82 F.3d 1243, 1249 (2d Cir. 1996) (*Batson* challenges must be raised before the conclusion of jury selection); *Government of Virgin Islands v. Forte*, 806 F.2d 73, 75-76 (3d Cir. 1986) (*Batson* objection was not timely because it was not raised before the end of jury selection); *Morning v. Zapata Protein*

*(USA), Inc.*, 128 F.3d 213, 216 (4th Cir. 1997) (*Batson* challenge is timely if it is raised before the jury venire is dismissed and trial commences); *United States v. Romero–Reyna*, 867 F.2d 834, 837 (5th Cir. 1989) (timely *Batson* challenge must be raised before venire is dismissed and trial commences); *United States v. Tomlinson*, 764 F.3d 535, 536 (6th Cir. 2014) (*Batson* challenge was timely when it was raised while the venire was still in the courtroom and available); *United States v. Williams*, 819 F.3d 1026, 1029 (7th Cir. 2016) (*Batson* challenge must be brought before the venire is dismissed, provided that the district court provided the parties an opportunity to raise objections); *United States v. Parham*, 16 F.3d 844, 847 (8th Cir. 1994) (*Batson* challenge must be raised, at the latest, "before the venire is dismissed and before the trial commences"); *Dias v. Sky Chefs, Inc.*, 948 F.2d 532, 533-34 (9th Cir. 1991) (a challenge to the composition of a jury was untimely when it was not raised until after the venire had been dismissed and the jury had been sworn); *United States v. Jones*, 24 Fed. Appx. 968, 976 (10th Cir. 2001) (unpublished opinion) (declining to reach a *Batson* challenge or remand the issue when district court was not given an opportunity to address the matter before the venire was dismissed); *United States v. Cashwell*, 950 F.2d 699, 704 (11th Cir. 1992) (*Batson* challenge must be raised as soon as possible and during jury selection).

State courts also require a timely objection to raise a *Batson* challenge. See *Bell v. State*, 535 So. 2d 210, 212 (Ala. 1988) (before jury sworn); *People v. Cunningham*, 61 Cal. 4th 609, 662, 189 Cal. Rptr. 3d 737, 352 P.3d 318 (2015) (before jury sworn); *State v. Robinson*, 237 Conn. 238, 250, 676 A.2d 384 (1996) (before jury sworn); *Idaho v. Ish*, 166 Idaho 492, 501, 461 P.3d 774 (2020) (before jury sworn and prospective jurors dismissed); *Washington v. Commonwealth*, 34 S.W.3d 376, 378 (Ky. 2000) (except for good cause, before jury sworn and jury pool dismissed); *State v. Williams*, 524 So. 2d 746, 746 (La. 1988) (before entire jury panel sworn); *State v. Aubrey*, 609 So. 2d 1183, 1185 (La. Ct. App. 1992) (*Batson* challenge must be raised contemporaneously with peremptory strike); *Stanley v. State*, 313 Md. 50, 69, 542 A.2d 1267 (1988) (before last juror sworn); *People v. Knight*, 473 Mich. 324, 348, 701 N.W.2d 715 (2005) (before jury

sworn); *State v. Gomez*, 721 N.W.2d 871, 885-86 (Minn. 2006) (before jury sworn); *Thomas v. State*, 517 So. 2d 1285, 1287 (Miss. 1987) (before jury sworn); *State v. Parker*, 836 S.W.2d 930, 935-37 (Mo. 1992) (before jury pool dismissed); *State v. Parrish*, 327 Mont. 88, 92, 111 P.3d 671 (2005) (issue waived unless raised before jury sworn and jury pool dismissed); *State v. Covarrubias*, 244 Neb. 366, 371, 507 N.W.2d 248 (1993) (before jury sworn), *overruled on other grounds by State v. Pierce*, 248 Neb. 536, 537 N.W.2d 323 (1995); *Rousseau v. State*, 824 S.W.2d 579, 581 (Tex. Crim. App. 1992) (before jury sworn); *State v. Harris*, 289 P.3d 591, 595 (Utah 2012) (waived unless raised before jury sworn and jury pool dismissed); *Hill v. Berry*, 247 Va. 271, 273-74, 441 S.E.2d 6 (1994) (unless permitted by court, before jury sworn); *State v. Jones*, 218 Wis. 2d 599, 601-03, 581 N.W.2d 561 (Wis. Ct. App. 1998) (before jury sworn or the issue is waived). The only state that appears to have taken a different view is Washington, which requires people to bring a *Batson* challenge "at the earliest reasonable time while the trial court still has the ability to remedy the wrong." *City of Seattle v. Erickson*, 188 Wash. 2d 721, 729, 398 P.3d 1124 (2017).

The rule our court adopted in *Heiskell* thus aligns with the practices of the overwhelming majority of state and federal courts. It also comports with Kansas statutes governing jury selection, which generally require objections to the composition of the jury panel to be raised before the jury is sworn. See K.S.A. 22-3410(3) (challenges for cause); K.S.A. 22-3407(1) (challenges to jury panel selection).

More importantly, *Heiskell*'s rule makes practical sense and aims to safeguard the rights *Batson* was designed to protect. A timely objection allows a court to remedy a *Batson* violation without unduly burdening the parties, the court, and the prospective jurors. If a meritorious *Batson* challenge is raised during jury selection, an improper peremptory strike may simply be disallowed. But the only remedy for a meritorious objection after dismissal of the venire members and administering the jury oath is to declare a mistrial—a form of relief Jackson never sought in this case—and to begin

12

proceedings anew. Starting over with a new jury panel imposes significant burdens on the court, the litigants, and the witnesses.

These practical considerations are consistent with the Supreme Court's statements in *Batson*. Though the *Batson* Court declined "to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges," it discussed potential remedies for a State's discriminatory use of peremptory strikes. 476 U.S. at 99. The Court noted that, after a finding of intentional discrimination, district courts could choose to "discharge the venire and select a new jury from a panel not previously associated with the case" or "disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated on the venire." 476 U.S. at 99 n.24. Neither option would be viable if the struck members of the panel had been dismissed or if a jury had already been sworn.

And requiring a party to raise a *Batson* challenge before the jury is sworn and the remaining venire released is the only way to safeguard the dual rights *Batson* aimed to protect. *Batson* sought to address the evils of racial discrimination suffered both by a person denied a jury of his or her peers and by the prospective juror who has been the target of that racial discrimination. Though considering an untimely objection could benefit the person raising a *Batson* challenge, it would provide no redress to the potential juror who has been improperly removed. See *J.E.B. v. Alabama*, 511 U.S. 127, 140, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994) (noting that *Batson* challenges are designed to remedy "harm to the litigants, the community, and the individual jurors who are wrongfully excluded").

For these reasons, we adhere to our decision in *Heiskell* that a *Batson* challenge must be raised before the remaining venire members are released and the last juror is sworn in order for it to be addressed. *Heiskell*, 21 Kan. App. 2d 105, Syl. ¶ 1. In so holding, we acknowledge that enforcing *Heiskell*'s timely objection requirement means

13

that some potentially discriminatory actions will go unchallenged. In this case, for example, the practical result of the timely objection rule was that the district court had no opportunity to investigate the State's reasons for its peremptory strikes. At the same time, we note that by requiring parties to vigilantly abide by the *Heiskell* rule, we heighten parties' attentiveness to the possibility of discriminatory acts and preserve courts' ability to protect defendants' rights and the rights of prospective jurors from being denied the opportunity to serve for discriminatory reasons.

Applying this rule to the case before us, the district court did not err when it found Jackson had not raised a timely *Batson* challenge. The district court here gave the parties ample opportunities to raise *Batson* issues, specifically inquiring after the parties had completed their peremptory strikes whether either party had any objection or issue to raise. Even if Jackson and his counsel had not recognized at that time that all Black potential jurors had been removed through peremptory strikes—a questionable assertion since the juror questionnaires indicated each prospective juror's race—Jackson nevertheless could have objected to the composition of the jury as the jurors were seated and before the remaining venire members were released. He did not do so. And he offers no reason for this oversight, except his attorney's statement that she typically does not "pay attention to that"—that is, racial considerations—"too much" when selecting a jury.

As a final matter, Jackson argues that even if the district court was generally correct when it found his *Batson* request was untimely, it should have nevertheless allowed him to question the prosecutor about the reasons for the peremptory strikes to "make a record" for later proceedings. We appreciate Jackson's efforts to record the State's reasons for its peremptory strikes while the memory of those actions was fresh. After all, when given the opportunity, appellate courts favor a more complete record that allows for a more complete review of the proceedings at trial. But we cannot say that the district court abused its discretion when it did not allow Jackson to question the prosecutor regarding his motives and thus engage in an untimely *Batson* analysis. And

14

given our holding that Jackson's objection was not timely presented, Jackson has not shown that he suffered any prejudice when the court ruled that it was too late to question the prosecutor.

To summarize, a *Batson* challenge must be raised in a manner that allows the district court to fashion a remedy in the event a violation has occurred. This prerequisite entails not only specificity in the substance of the challenge, but also a critical timing element: The objecting party must raise the challenge before unselected venire members are released and before the jury is sworn. Because he raised his *Batson* objection after the court dismissed the unselected venire members and empaneled the jury, Jackson's objection was untimely, and the court could no longer take steps to correct any alleged discrimination and yet still allow the trial to proceed. The district court did not err when it overruled Jackson's *Batson* challenge.

## 2. *Instructions on robbery and theft were not factually appropriate in this case.*

Jackson also asserts the district court erred when it failed to instruct the jury on robbery and theft as lesser included offenses of aggravated robbery. Jackson acknowledges that he did not request these instructions at his trial. He therefore must demonstrate the instruction should have been given and the absence of the instruction was clearly erroneous. K.S.A. 2020 Supp. 22-3414(3).

In reviewing challenges to jury instructions, appellate courts engage in a multistep review. We first determine whether the omitted instruction was legally and factually appropriate. *State v. Williams*, 295 Kan. 506, Syl. ¶ 4, 286 P.3d 195 (2012). If the instruction was appropriate, we consider whether its omission requires reversal, applying either a harmless-error or a clear-error standard, depending on whether the error was raised to the district court. See 295 Kan. at 515-16.

15

The parties agree that instructions on robbery and theft would have been legally appropriate, as robbery and theft are both lesser included offenses of aggravated robbery. See *State v. Plummer*, 295 Kan. 156, 164, 283 P.3d 202 (2012) (theft); *State v. Whitaker*, 255 Kan. 118, 128, 872 P.2d 278 (1994) (robbery). But they disagree as to whether those instructions were factually appropriate. Jackson argues that because the elements necessary to prove aggravated robbery would have been sufficient to prove robbery and theft, some evidence at trial supported giving these instructions. The State counters that instructions on robbery and theft would not have been appropriate in Jackson's case because no one disputed that the robber used a dangerous weapon—the element which elevates simple robbery to aggravated robbery—at the 7-Eleven.

After carefully reviewing the evidence presented and the parties' arguments at trial, we agree with the State. This case hinged on the identity of the man who robbed the 7-Eleven. All the witnesses, including the clerks, described the robber using a handgun, and the security camera footage confirmed this. Jackson did not dispute these facts; his defense was that he was not the person who committed the robberies. Instructions regarding robbery and theft were therefore not factually appropriate in this case. A district court has no obligation to instruct the jury on factually inappropriate matters. The district court committed no error when it did not instruct the jury on those crimes.

3. *The parties agree that the case must be remanded for resentencing.*

In his final claim on appeal, Jackson argues the court incorrectly calculated his criminal history score at sentencing by classifying his prior Missouri conviction for attempted first-degree statutory sodomy as a person felony. See *State v. Jones*, No. 117,808, 2018 WL 4656409, at *5-8 (Kan. App. 2018) (unpublished opinion). The State agrees the crime should be categorized as a nonperson felony, noting the Missouri definition of "attempt" is broader than the definition under Kansas law. In light of this

error, we vacate Jackson's sentence and remand the case so Jackson may be resentenced using a correct criminal history score.

We affirm Jackson's convictions, vacate his sentence, and remand the case with directions.